UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EMILY E. HAYES,

       Plaintiff,

   v.

NANCY A. BERRYHILL,

       Defendant.

Case No.17-cv-02337-EDL

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 20, 23

     Plaintiff Emily Hayes filed this lawsuit pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner of Social Security's decision to deny her application for disabled child's Social Security Disability Insurance benefits (SSDI) pursuant to 42 U.S.C. § 423 and Supplemental Security Income (SSI) disability benefits pursuant to 42 U.S.C. §§ 1381a and 1382c(a)(3)(A).[1]  Currently before the Court are the parties' cross motions for summary judgment. For the reasons set forth above, the Court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment, and REMANDS for further proceedings.

# I.    BACKGROUND

     Plaintiff was fifteen years old at the time of her alleged disability onset of January 1, 2009. AR 69.  She was twenty years old at the time of her applications.  AR 39.  Plaintiff left high school after the tenth grade and has not been able to complete her high school equivalency degree. AR 39, 97.  At the time of her application for disability benefits, she alleged that she suffered from anxiety and depression, attention deficit disorder, sleep problems, obesity, and chronic aches and pains.  AR 69.  Plaintiff has no work history.  AR 77.

---

[1] Plaintiff applied for SSDI survivor benefits under the Social Security number of her deceased father.

### A. Procedural History

On April 26, 2013, Plaintiff filed simultaneous applications for disability benefits under SSDI and SSI, alleging a disability onset date of January 1, 2009. Her applications were initially denied on December 9, 2013, and upon reconsideration on March 17, 2014. AR 69-79, 80-90, 91-103, 104-18, 119-23, 124-28, 131-36, 137-42.

Plaintiff requested a hearing, and administrative law judge Maxine R. Benmour ("ALJ") held a hearing on July 29, 2015. AR 37-68. The ALJ issued an unfavorable decision on both of her applications on December 24, 2015. AR 19-30. Upon reconsideration, the Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 16, 2017. AR 1-3. On that date, the ALJ's decision became final. Plaintiff then filed this lawsuit on April 25, 2017. Dkt. No. 1.

On October 27, 2017, Plaintiff moved for summary judgment, asking the Court to reverse the final decision of the Commissioner and order the payment of benefits, or alternatively to remand for a new hearing before an ALJ. On December 14, 2017, the Commissioner filed a combined opposition and cross motion for summary judgment, asking the Court to affirm the Commissioner's decision. Plaintiff filed a reply brief on December 28, 2017.

### B. Plaintiff's Medical History

#### 1. Various Kaiser Permanente Doctors (treating physicians)

Starting in 2006, Plaintiff began receiving treatment for heavy and irregular menstrual periods, a condition referred to in her medical records as menorrhagia and/or menometrorrhagia. AR 364-68; 398. Her physicians prescribed birth control medications to control the bleeding. AR 377-78; 379-85; 393; 404-05; 419-33; 537-42; 548-54; 558-73; 585-87; 591-93; 595-98; 629-32. This condition continued through at least 2013. Plaintiff's medical records also show that she received treatment over the years for ingrown nails, ear infections, vision problems, throat infection, and other minor ailments. AR 376-78; 394-96; 401-03; 406-07; 446-73; 490-93; 497-517; 543-47.

On July 6, 2009, Plaintiff's mother contacted her treating physician at the time, Kathryn Reid, M.D., for a referral for bariatric surgery. AR 441. Plaintiff received the referral, but

ultimately did not receive the surgery because she did not complete the program's prerequisite that she lose 35 pounds first. AR 445; 474-76; 494-96; 522.

Plaintiff contacted Ine Maria George, M.D., via email on February 22, 2012, asking for an increase in her Prozac prescription from 40mg to 60mg, reporting that Prozac worked for the most part but she did not feel that her results were optimized yet. AR 518-19. The medical record does not indicate when and by whom Plaintiff was originally prescribed Prozac. Before modifying the prescription, Dr. George required Plaintiff to attend an appointment in person, which was held on March 14, 2012. AR 518, 521-529. Upon examination, Dr. George diagnosed Plaintiff with Major Depression, Single Episode, In Full Remission, and increased her Prozac prescription to the requested 60mg. AR 523. In February 2013, Plaintiff asked Dr. George for a referral to a psychiatry program because her depression was getting worse and she did not feel that Prozac was sufficient. AR 580-82. Dr. George made the referral on February 8, 2013. AR 580.

### 2. Julia Li, M.D. (treating psychiatrist)

Plaintiff began seeing Julia Li, M.D., for psychiatrist treatment on March 19, 2013. AR 308-12, 672-75. Plaintiff sought treatment for depression and anxiety, which she reported that she started experiencing around 11 or 12 years of age. AR 309. She reported low mood, being irritated easily, feeling tired, low motivation, and low interest in activities. AR 309. She denied any active suicidal ideation or plans, intent, or attempts, but she stated that "sometimes she felt she wished [she did] not exist." AR 309. She also reported anxiety and feeling overwhelmed and anxious in social situations. AR 309. At the time of her first appointment with Dr. Li, Plaintiff was taking Prozac for depression, but she still reported feeling depressed and having social anxiety. AR 309. She had previously tried taking Cymbalta, but that made her feel angry and she changed back to Prozac about 3 or 4 years ago. AR 309. Dr. Li noted that her mood was depressed on a mental status examination but otherwise the examination was unremarkable. AR 310-11. Dr. Li reduced Plaintiff's Prozac prescription from 60mg to 40 mg and added a prescription for Wellbutrin. AR 311.

At her next visit with Dr. Li on April 18, 2013, Plaintiff described her symptoms of depression as "significantly improved," but reported no change in her social anxiety. AR 315. Dr.

Li did not make any changes to Plaintiff's treatment plan at that time. AR 316-17.

After these two initial visits in March and April 2013, Plaintiff continued to receive treatment from Dr. Li through in-person visits and email correspondence. Most of Dr. Li's treatment notes describe their efforts to modify Plaintiff's medicine regime. Usually, these modifications were made at Plaintiff's request when she was not experiencing the results she hoped for from her current medications. AR 319-23; 348-53; 714-19; 734-35; 740; 749-50; 753-54. Sometimes Plaintiff conducted her own research and made suggestions for how her medications could be changed. For example, in June 2013, Plaintiff wrote to Dr. Li that her depression had grown worse, and she would spend the entire day in bed and sometimes have panic attacks. AR 325. She suggested that she might take something in addition to Prozac, specifically asking about Lexapro, and Dr. Li agreed that she could try Lexapro to see if it would improve her condition. AR 324-30.

Plaintiff had an in-person visit with Dr. Li in July 2013, during which she reported that the Lexapro did not help, she felt more depressed than before, and Dr. Li prescribed Lamictal to see if it would help with her mood instability and anxiety. AR 331-36. Dr. Li's mental status evaluation of Plaintiff revealed that she had a depressed mood but otherwise the evaluation was normal. AR 334. On September 16, 2013, Plaintiff wrote an email to Dr. Li that she had researched taking Lamictal and concluded that the negative potential side effects outweighed its benefits, and decided to return to taking Prozac only. AR 348-53.

Plaintiff saw Dr. Li on January 7, 2014 because she wanted to take another medication in addition to Prozac. AR 714-19. Dr. Li offered a prescription for Seroquel for her symptoms of mood instability, constant anxiety, and trouble staying asleep. AR 717. Plaintiff declined a prescription for this medication because she did not want to waste time trying a medication that might make her feel worse. AR 717. Dr. Li also suggested that she could add a prescription for Abilify, in addition to Prozac, but ultimately Abilify was not prescribed. AR 717-19. Later, on January 13, 2014, Plaintiff wrote Dr. Li an email that she had decided to try Abilify after conducting some research and considering it further. AR 721, 725-26. A few weeks later, she wrote another email to Dr. Li stating that adding the Abilify to the Prozac "helped significantly"

4

for enabling her to get out of bed but had not improved her mood and had heightened her irritability and anxiety. AR 728. She reported that she would stay on Abilify but decrease the dosage with Dr. Li's assent. AR 728-32.

In March 2014, Plaintiff contacted Dr. Li again through email. AR 734-35. She stated that she noticed her depression increasing again after she switched to a hormone pill to regulate her menstrual cycle. AR 734. She asked if she could try Wellbutrin again, in addition to the Prozac, because she had had the best results so far with that combination. AR 734. She also inquired about the differences between the standard Wellbutrin and the extended-release version, noting that a friend had experienced good results with the standard version. AR 734. She stated that the Abilify was not helping her anymore and may be making things worse and, therefore, a change was necessary. AR 734. In response to this email, Dr. Li wrote in her treatment notes that it appeared that Plaintiff was "medication shopping" after conducting her own online research and speaking to a friend. AR 737. A couple of weeks later Plaintiff sent another email asking if she would benefit from a higher dose of Wellbutrin, although she did report doing well on the medication. AR 740. Dr. Li allowed Plaintiff to try the requested higher dosage of Wellbutrin. AR 742-43. Plaintiff reported feeling "somewhat better" with the increased Wellbutrin dosage when she spoke to Dr. Li several weeks later. AR 749-50.

On November 8, 2014, Plaintiff emailed Dr. Li again about obtaining an evaluation to determine if she had Attention Deficit Disorder ("ADD"). AR 762-64. Plaintiff noted that had a "good handle on [her] depression with the combination of the Prozac and Wellbutrin, and even [her] social anxiety has seemed to calm down some." AR 763. However, after self-evaluation and research, she asked Dr. Li to consider if she had ADD because of her ongoing "pretty severely debilitating problems." AR 763. After an in-person consultation about ADD on November 12, 2014, Dr. Li gave Plaintiff a prescription for Ritalin based on her reported difficulty with concentration, organization, and poor academic function. AR 772. Dr. Li noted that Plaintiff's anxiety and depression appeared stable. AR 772. Two days later, Plaintiff emailed Dr. Li because she had developed minor headaches when taking the Ritalin and wondered if she should try Adderall instead. AR 775. Plaintiff also noted that the headaches made her feel unsafe to

United States District Court
Northern District of California

drive, which she reporting doing a significant amount of, and had also read that Adderall lasts

longer. AR 775-79. During a follow-up telephone call with Dr. Li on December 23, 2014 after

Plaintiff switched to Adderall, she reported that she tolerated the Adderall well and that she was

doing "ok" on her current medications of Prozac, Wellbutrin, and Adderall. AR 781-82.

Dr. Li provided a medical source statement for Plaintiff dated June 16, 2015. AR 655-60.

She opined that Plaintiff is severely impaired in her: (1) ability to work in coordination with or

proximity to others without being unduly distracted by them; (2) complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods; (3) interact

appropriately with the general public; (4) accept instructions and respond appropriately to

criticism from supervisors; (5) get along with co-workers or peers without unduly distracting them

or exhibiting behavioral extremes; (6) respond appropriately to changes in the work setting; (7) be

aware of normal hazards and take appropriate precautions; (8) travel in unfamiliar places or use

public transportation; and (9) set realistic goals or make plans independently of others. AR 656-

57.

Dr. Li opined that Plaintiff is moderately severely limited in her ability to: (1) perform

activities within a schedule, maintain regular attendance and be punctual within customary

tolerances; (2) sustain an ordinary routine without special supervision; and (3) maintain socially

appropriate behavior and adhere to basic standards of neatness and cleanliness. AR 656-57. She

concluded that Plaintiff had moderate limitations on her ability to: (1) understand and remember

detailed instructions; and (2) carry out detailed instructions. AR 656-57. Dr. Li opined that she is

mildly impaired in her ability to make simple work-related decisions. AR 656. She found no

impairment in Plaintiff's ability to: (1) understand and remember very short and simple

instructions; (2) carry out short and simple instructions; and (3) ask simple questions or request

assistance. AR 656-57.

Regarding Plaintiff's ability to remember locations and work-like procedures and her

ability to maintain attention and concentration for extended periods, Dr. Li stated that she did not

know if Plaintiff is limited on those factors because Plaintiff did not have any work experience.

With respect to whether Plaintiff has a substantial loss of ability to understand, remember, and carry out simple instructions, Dr. Li stated that she did not know if she has a substantial loss but guessed that she did because she did not complete high school. AR 658. For the onset date of the assessed limitations, Dr. Li stated that they were "probably" since Plaintiff's teenage years and high school. AR 658. In sum, Dr. Li explained that Plaintiff had difficulty in high school and dropped out and also has difficulty in public due to anxiety. AR 659. She stated that Plaintiff has never worked due to her anxiety. AR 659.

### 3. Joshua Slater, Psy.D. (treating psychologist)

Joshua Slater, Psy.D., started treating Plaintiff for psychological issues in October 2014. AR 650. He completed a medical source statement dated May 18, 2015. AR 647-54. This is the only document in the medical record concerning Dr. Slater's treatment of Plaintiff.

In his statement, Dr. Slater opined that Plaintiff is severely limited in her ability to accept instructions and respond appropriately to criticism of supervisors. AR 649. He also opined that Plaintiff has moderately severe limitations in her: (1) ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (2) work in coordination with or proximity to others without being unduly distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) ask simple questions or request assistance; (6) travel in unfamiliar places or to use public transportation; and (7) set realistic goals or make plans independently of others. AR 648-49.

He further opined that she is moderately limited in her ability to: (1) maintain attention and concentration for extended periods; (2) sustain an ordinary routine without special supervision; (3) make simple work-related decisions; and (4) respond appropriately to changes in the work setting. AR 648-49. He also concluded that she had the following mild impairments: (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and (5) maintain socially appropriate behavior and adhere to

7

basic standards of neatness and cleanliness.  AR 648-49.  He opined that she has no significant impairment in her ability to: (1) understand and remember very short and simple instructions; (2) carry out short and simple instructions; (3) be aware of normal hazards and take appropriate precautions.  AR 648-49.

He stated that Plaintiff has had these limitations since he began treating her in October 2014, and she reported that they have been present since late adolescence.  AR 650.  Dr. Slater's diagnosis was Major Depressive Disorder, Moderate, Recurrent, and Social Anxiety Disorder.  AR 652.  He described her symptoms as low mood and lack of interest in pleasurable activities, impairment in concentration and attention, mild hopelessness, feelings of guilt and worthlessness, periodic suicidal ideation without current or recent reported plan or intent, somatic symptoms (sleep disturbance and body pains), and social withdrawal.  AR 652.  He also noted that she avoids public settings and interactions with new people and only tolerates them with significant distress.  AR 652.  He explained that he did not observe basic underlying deficits in her cognitive functioning as to memory, attention, and concentration, but that her emotional distress interferes with these abilities and undermines her ability to otherwise complete simple tasks.  AR 653.  He also concluded that her emotional distress would interfere with her ability to maintain a normal work schedule and cause undue absences and interfere with her productivity.  AR 653.

Although he stated that her symptoms are unlikely to change in the near term, he reported that her long-term prognosis is guardedly positive.  AR 653.  He explained that she is most likely to achieve positive results through long-term psychotherapy.  AR 653.

### C.    State Agency Disability Determinations

#### 1.    Initial Determination

Howard S. Leizer, Ph.D., reviewed Plaintiff's applications and issued opinions about her psychological functional limitations on December 9, 2013.  AR 75-76, AR 86-87.  In summary, he stated that "[a]lthough she has significant social anxiety, she appears capable of performing work at all levels though with limited social interaction with the public and coworkers."  AR 76, 87.  He assessed moderate limitations on her ability to interact appropriate with the general public, accept instructions and respond appropriate to criticism from supervisors, get along with coworkers and

8

peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  AR 76, 87.  He did not find that her ability to ask simple questions or request assistance was significantly limited.  AR 87.  He opined that she had no restrictions on her ability to sustain concentration, persistence, or pace, and no restrictions on her understanding and memory.  AR 76, 87.

A medical doctor, Richard Surrusco, M.D., also opined on her physical functional limitations.  AR 74-75, 85-86.  He assigned the following exertional limitations: occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; and stand, walk, or sit 6 out of 8 hours a day.  AR 74-75, 86.

In light of these assessments, the state agency concluded that Plaintiff was not disabled.  AR 77, 88.

### 2.    **Reconsideration Level**

On reconsideration, L. Colsky, M.D., made an assessment of Plaintiff's psychological functional limitations on March 3, 2014.  AR 100-02, 113-15.  Dr. Colsky opined that Plaintiff is capable of performing work at all levels, notwithstanding her significant social anxiety.  AR 101, 114. He opined that she was moderately limited in her ability to interact appropriately with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  AR 101, 114.  He opined that she was not significantly limited in her ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  AR 101, 114.  He assigned no restrictions in her understanding and memory or ability to sustain concentration, persistence, or pace.  AR 101, 114.

D. Lee, M.D., also assessed Plaintiff's physical functional limitations in an opinion dated March 17, 2014.  AR 98-100.  Dr. Lee opined that she had the following exertional limitations: occasionally life and carry 20 pounds; frequently lift and carry 10 pounds; stand, walk, or sit 6 out of 8 hours a day; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance and stoop; and occasionally kneel, crouch, or crawl.  AR 99, 112.  He also opined that she should avoid even moderate exposure to hazards such as machinery and heights.

AR 100, 113.

Based on these assessments, the state agency concluded that Plaintiff was not disabled in an opinion dated March 17, 2014. AR 103, 116.

### D.    ALJ Hearing

#### 1.    Plaintiff's Testimony

The ALJ opened the hearing by asking Plaintiff to describe her education and work background. Plaintiff testified that she left school after completing the tenth grade and she never returned to finish high school or receive a high school equivalency diploma. AR 39. She also testified that she has never worked. AR 39. She explained that she stopped attending high school because of her depression and anxiety, which made it difficult for Plaintiff to leave bed in the morning. AR 39. She stated that she has dealt with depression and anxiety since she was fourteen years old and they are still affecting her presently. AR 39. She described having negative thoughts and the inability to find joy or interest in anything, along with feelings of hopelessness and worthlessness. AR 40. She described feeling anxiety in social situations or when she thinks about social situations, which results in an increased heart rate, feeling cold and sweaty, and her mind going blank. AR 40.

Plaintiff testified about the psychiatric treatment she has received through Dr. Li. AR 41. At the time of the hearing in 2015, Plaintiff had been seeing Dr. Li, a psychiatrist, for approximately two years, and she has appointments with her every few months to discuss changes to her medications. AR 41. Plaintiff testified that she was taking Prozac, Wellbutrin, and, on occasion, Ritalin. AR 42. She had not taken the Ritalin for months because it did not help her maintain focus, but she was taking the Prozac and Wellbutrin every day. AR 42, 61. She reported that the Prozac and Wellbutrin help a little bit with her depression and anxiety to "make it a little less unbearable." AR 42. She testified that she sometimes has anxiety attacks, which are more frequent when she engages in activities like attending school or doctor appointments. AR 43-44. She also said she sometimes has anxiety attacks now when she thinks about the state of her existence. AR 44. She stated that without the medications she tends to be more suicidal. AR 42. She explained that while she is on these medications, she has thoughts about suicide occasionally

but does not seriously consider it, in contrast to when she was younger and before she was on the medications when she seriously considered suicide. AR 42-43. She started taking Prozac when she was thirteen or fourteen, and she has tried other medications over time, such as the mood stabilizer Seroquel, but nothing has helped as much as Prozac. AR 43, 61. She started taking Wellbutrin within about a year of the hearing. AR 43.

She testified that Dr. Li has not referred her to see a counselor or therapist. AR 44. However, she stated that she started seeing Dr. Slater around October 2014 and she saw him once a week until he quit his practice, after which she began seeing Dr. Amy Calderola who she had seen about twice before the hearing.[2] AR 44-45. Her mother also usually joins her for doctors' appointments, otherwise Plaintiff stated that she feels scared going alone. AR 60.

Plaintiff also testified about difficulties she has experienced with her menstrual cycle. AR 49. She explained that she takes birth control medication to regulate her menstrual cycle now, but before she was on that medication she would have continuous menstruation that would continue for months without stopping. AR 49. She testified that her heavy menstruation caused anemia for a period of time. AR 49. Her current menstruation is very heavy and accompanied by painful cramps. AR 49. In addition to birth control to regulate her menstrual cycle, she also takes Motrin while she menstruates to help with the painful cramping she experiences. AR 49. She also testified to experiencing headaches and fatigue while she menstruates and tries to sleep the entire seven to ten days. AR 49-50.

In addition to Prozac, Wellbutrin, birth control, and Motrin, Plaintiff also takes melatonin to help her sleep and magnesium for restless legs. AR 50. She reported that the melatonin helps with her difficulty sleeping. AR 50. She has not noticed any side effects from her medication. AR 51.

Plaintiff discussed her complaints of joint pain, which she thought was likely related to her

---

[2] At the time of the hearing, the records from Plaintiff's visits to Dr. Calderola were not part of the administrative record. AR 46. Plaintiff testified that she had just begun seeing Dr. Calderola and they had not discussed "anything of significance" at their initial two meetings. AR 46. Dr. Calderola's records were not added to the administrative record at any time before Plaintiff filed this lawsuit.

obesity.  AR 55.  She stated that at the time of the hearing she was 5'9" or 10" tall and weighed about 400 pounds.  AR 56.  She testified that the pain in her knees was the worst, that her ankles get stiff and sore when she climbs stairs or walks, and that she sometimes has pain in her fingers.  AR 56.  She explained that she is not seeing a doctor for this pain because she is too embarrassed to seek treatment for it.  AR 56.  She testified that the Motrin she takes for her menstruation-related pain also helps with her joint pain.  AR 56.

The ALJ asked Plaintiff about any efforts she has made to find employment.  AR 51.  Plaintiff responded that she has never looked for or applied for jobs because she does not believe she would be able to maintain employment.  AR 51.

When asked to describe her normal daily routine, Plaintiff explained that she sleeps until about 2:00 or 3:00 p.m. during the week while her mother is at work after falling asleep between midnight and 3:00 a.m.  AR 56-57.  After she wakes up, she stated that she tries to pass the time, most recently by watching short videos on YouTube and eating crackers.  AR 57-58.  Otherwise, she testified that she does not really use her computer.  AR 58.  She generally stays in her room during the day.  AR 58.

Plaintiff testified that she does not socialize and she has not had friends since she was fifteen years old.  AR 51.  She stated that she no longer socializes because it is exhausting for her, and she only socializes with her mother who she lives with and very close relatives if necessary.  AR 52.  When she socializes with her family, she mostly sits and listens to them talk.  AR 52.  Plaintiff stated that she would sometimes accompany her mother to the movies, but she finds it difficult to pay attention and follow the story line.  AR 52.  She testified that she will also sometimes watch television with her mother to keep her company, but she does not like to watch any shows of her own accord.  AR 53.  She stated that even a thirty minute video is not easy for her to follow.  AR 53.  As for other hobbies, she noted that she used to draw, but she stopped doing that when she was seventeen or eighteen because her ability to focus has deteriorated.  AR 53.  She also does not read because of her difficulty focusing.  AR 61.  She explained that sometimes she will accompany her mother in the car when she runs errands, such as grocery shopping.  AR 60.

Plaintiff also spoke about her personal hygiene habits. She explained that she does not get dressed and groomed every day, but only does so when it is necessary to go somewhere or see someone. AR 54. Otherwise, she showers approximately once a week. AR 54. Plaintiff stated that she does not generally help her mother with chores around the house, like cleaning and cooking, because she has too much difficulty focusing. AR 54.

### 2. **Vocational Expert Testimony**

At the July 29, 2015 hearing, vocational expert Lynda Berkley testified. The ALJ asked her to consider whether a hypothetical person with the following limitations could perform any jobs in the regional or national economy: (1) lift and carry 20 pounds occasionally and 10 pounds frequently; (2) sit, stand, or walk six hours each in an eight-hour workday; (3) never climb ladders, ropes, or scaffolds; (4) frequently balance and stoop; (5) occasionally climb ramps and stairs; (6) occasionally kneel, crouch, and crawl; (7) must avoid even moderate exposure to hazards; (8) limited to simple, repetitive tasks; and (9) only occasional contact with coworkers, supervisors, and the public. AR 64. Berkley responded that this hypothetical person could perform the jobs of housekeeping cleaner (DOT listing 323.687-014, light work with SVP 2), router, mail sorter (DOT listing 222.587-038, light work with SVP 2), and marker, retail (DOT listing 209.587-034, light work with SVP 2). AR 65. If this hypothetical person were to miss work three times a month, she testified that she would not be able to perform any jobs. AR 65.

Plaintiff's attorney asked Berkley to consider the limitations set forth in Dr. Slater's opinion dated May 8, 2015. AR 66. Dr. Slater concluded that Plaintiff had moderately severe limitations (i.e., a limitation that interferes with the ability to perform the designated activity and precludes the ability to perform it on a regular and sustained basis): (1) perform activities within a schedule; (2) maintain regular attendance and be punctual within customary tolerances; (3) work in coordination with or proximity to others without being unduly distracted; (4) complete a normal workday and work week without interruptions from psychologically-based symptoms; (5) perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; and (6) ask simple questions or request assistance. AR 66-67. Dr. Slater also opined that she is severely limited in her ability to accept instructions and

13

respond appropriately to criticism from supervisors.  AR 67.  Based on these limitations, Berkley testified that there is no job this hypothetical person could perform.  AR 67.

### E.    ALJ Decision

The ALJ rendered an unfavorable decision on both of Plaintiff's disability benefits applications in an opinion dated December 24, 2015. AR 19-30.

#### 1.    Step One -- Substantial Gainful Activity

The ALJ found that Plaintiff has not engaged in any substantial gainful activity since her alleged disability onset date of January 1, 2009.  AR 21.

#### 2.    Step Two -- Severe Impairment(s)

The ALJ concluded that Plaintiff has the following severe impairments: morbid obesity, depressive disorder, anxiety-related disorder, and social phobia.  AR 21.  The ALJ found that Plaintiff's gynecological symptoms and menorrhagia (abnormal bleeding during menstruation) are non-severe.  AR 22.

#### 3.    Step Three -- Listed Impairment(s)

The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 22-23.  The ALJ noted that obesity is not, by itself, a listed impairment, but she nonetheless considered this disorder and its effect on the medically determined impairments in accordance with Social Security Ruling 02-1p.  AR 22.  She also considered whether Plaintiff's mental impairments, either alone or together, met or medically equalthe criteria of listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  AR 22-23.  The ALJ concluded that Plaintiff did not satisfy the "paragraph B" or "paragraph C" criteria to meet either of these listings.  AR 22-23.

#### 4.    Step Four -- Past Relevant Work

At step four, the ALJ found that Plaintiff does not have any past relevant work.  AR 29.

#### 5.    Step Five -- Ability to Perform Other Work

Because Plaintiff does not have any work history, the ALJ proceeded to consider the final step in the sequential evaluation.  At step five, the ALJ was tasked with determining whether there

14

1    are jobs that exist in significant numbers in the national economy that Plaintiff can perform in

2    light of her age, education, work experience, and residual functional capacity.  AR 29-30.  The

3    ALJ determined that Plaintiff was fifteen years old on her alleged disability onset date, has a

4    limited education, and is able to communicate in English.  AR 29.

5        Before making this determination, the ALJ was required to assess Plaintiff's RFC.  The

6    ALJ concluded that Plaintiff is capable of performing light work (as defined in 20 C.F.R. Part

7    404.1567(b) and 416.967(b)), except that she is limited to occasional climbing of ramps and stairs,

8    kneeling, crouching, and crawling and frequent balancing and stooping and precluded from

9    climbing ropes, ladders, and scaffolds.  AR 24.  Further, Plaintiff must avoid even moderate

10   exposure to hazards and she is limited to simple, repetitive tasks with occasional contact with

11   supervisors, coworkers, and the public.  AR 24.

12       In reaching this RFC assessment, the ALJ considered the various medical opinions in the

13   record.  She assigned great weight to the March 17, 2014 opinion of the state agency consultant

14   who found that Plaintiff is capable of light work with occasional climbing of ramps and stairs,

15   kneeling, crouching, and crawling with frequent balancing and stooping and no climbing of ropes,

16   ladders, and scaffolds, and that she should avoid hazards of work at heights and around moving

17   machinery.  AR 24.  The ALJ explained that Plaintiff's morbid obesity diminished her mobility

18   and exertional capacity, but that except for her excess weight there are no medical complications

19   to preclude light exertion and there has been no aggressive medical care provided as a result of

20   secondary complications of her obesity.  AR 24.

21       She also relied on the state agency consultant's determination that Plaintiff retains the

22   ability to complete simple, repetitive tasks with occasional interaction with coworkers and the

23   public.  AR 26.  Although she acknowledged Plaintiff's diagnoses of depression and anxiety, the

24   ALJ concluded that her diagnoses were not inconsistent with these limitations.  AR 26.  She

25   explained that Dr. Li's mental status examinations have been unremarkable, except for depressed

26   mood, and her trials of different medications have yielded good results, which support the ability

27   to engage in simple, repetitive work.  AR 26.  Further supporting the conclusion that Plaintiff can

28   sustain simple, repetitive work, the ALJ noted that the medical record shows that Plaintiff

composes emails to Dr. Lie that demonstrate that she is competent in expressing her concerns about her medical disorders and indicate that Plaintiff has conducted online research about potential treatment options. AR 26. With respect to Plaintiff's anxiety, the ALJ stated that Plaintiff has had good results with medication and that Dr. Li noted in November 2014 that her anxiety was stable. AR 26. She also noted that Plaintiff has had no hospitalizations or acute medical attention for her depression or anxiety. AR 26. Moreover, she pointed out that Plaintiff attends weekly therapy sessions without trouble, in emails she sought Wellbutrin on the recommendation of a friend, and she reported concern about potential sickness after picking strawberries with her mother. AR 26. The ALJ concluded that her conservative and symptomatic care, as well as her continuing pursuit of activities, shows she has some capacity for interaction with others to support an RFC that permits occasional contact with supervisors, coworkers, and the public. AR 26.

In reaching this conclusion, the ALJ gave limited but not controlling weight to Dr. Slater's opinion that Plaintiff is moderately severely impaired in her ability to complete activities within a schedule, be punctual, maintain regular attendance, work in coordination with others without distracting them, complete a normal work day or work week without interruption from psychologically-based symptoms, and interact with the public. AR 26-27. She also gave limited weight to his opinions that Plaintiff is moderately limited in her ability to maintain concentration and attention for extended periods, complete ordinary routine without special or additional supervision, make simple decisions, and respond appropriately to changes in a work situation. AR 27. In assigning limited weight, the ALJ explained that Dr. Slater's opinion included the disclaimer that he was not asked to make a formal assessment of Plaintiff's occupational functional capacity, and that his "responses are based on [Plaintiff's] self-report and observations in session; no formal psychological assessment or assessment of response style was conducted, and no collateral information was gathered." AR 27. She also considered his prognosis for Plaintiff as guardedly positive and that she was somewhat stable, as confirmed by Dr. Li's notes that she was stable with medication. AR 27. Moreover, she explained that Dr. Slater's assessment of significant problems with social interaction was not corroborated with his treatment notes. AR

16

27.

The ALJ also accorded little weight to Dr. Li's opinion that Plaintiff would have severe difficulty working in coordination with or proximity to others without distracting them, completing a normal workday or work week without interruption from psychologically-based symptoms, and all aspects of social interaction and adaptation. AR 27. As to her limitations in ability to understand, remember, and carry out simple instructions, Dr. Li stated that she "guess[ed]" that she had substantial loss of ability to carry out simple instructions because she did not complete high school. AR 27. Dr. Li also expressed an inability to answer questions about her ability to maintain concentration and attention because of the absence of any work history. AR 27. The ALJ found that these opinions were only entitled to limited weight for several reasons. First, she noted that Dr. Li guessed at some questions because Plaintiff has no work history. AR 27. Second, Dr. Li said that her opinions about Plaintiff's functional ability "probably" existed while she was in high school even though she had only treated her since March 2013 when Plaintiff was nineteen years old. AR 27. Third, her opinion is inconsistent with the results of the mental status examinations she gave to Plaintiff which only showed a depressed mood with no significant signs of anxiety or other abnormal clinical signs. Fourth, the ALJ reasoned that there is no correlation between completing high school and the ability to perform simple, repetitive tasks. AR 27.

With respect to the medication that Dr. Li prescribed to Plaintiff for attention deficit disorder (Ritalin and then later Adderall), the ALJ concluded that there is no medically determined attention deficit disorder because the diagnosis was based on Plaintiff's reported symptoms and Dr. Li prescribed the medication without a formal evaluation and without abnormal findings supporting the diagnosis. AR 27-28.

The ALJ also considered Plaintiff's subjective complaints in reaching her RFC assessment. AR 28. While the ALJ concluded that her medically determinable impairments could reasonably be expected to cause the alleged symptoms complained of, she determined that Plaintiff's complaints about the intensity, persistence, and limiting effects of those symptoms were not entirely credible. AR 28. First, she noted that the medical record documents a depressed mood

17

but otherwise contains evidence of normal mental status examination results that do not corroborate the allegation of severe loss of concentration, attention, and focus.  AR 28.  Second, although Plaintiff reported significant social anxiety, the ALJ pointed out that Plaintiff interacts frequently with her mother and other family members, she goes to the movies with her mother and picked strawberries with her mother on one occasion, she denies having friends but told Dr. Li that a friend recommended Wellbutrin to her, and she has attended weekly therapy since October 2014, all indicating greater social interaction than she claims.  AR 28-29.  Third, the ALJ pointed out that Plaintiff complains of difficulty getting out of bed in the morning, but she does not go to sleep until sometime between midnight and 3:00 a.m.  AR 29.  Fourth, Plaintiff described a loss of interest in personal hygiene unless she has an appointment, which the ALJ attributed to a lack of appointments rather than her depression or anxiety.  AR 29.  Finally, the ALJ noted that Plaintiff has received conservative care that is inconsistent with the severe and persistent symptoms and limitations Plaintiff claims.  AR 29.  Although her mother corroborated her allegations, the ALJ concluded that the evidence as a whole does not support the degree of functional loss and the severity of symptoms alleged.  AR 29.

The ALJ relied on the vocational expert's testimony that given Plaintiff's RFC she would be able to perform the representative occupations of housekeeping cleaner (DOT listing 323.687-014, light work with SVP 2), router, mail sorter (DOT listing 222.587-038, light work with SVP 2), and marker, retail (DOT listing 209.587-034, light work with SVP 2).  AR 30.  Therefore, the ALJ found that Plaintiff is not disabled.  AR 30.

## II.    LEGAL STANDARD

This Court has the authority to review the Commissioner's decision to deny benefits.  42 U.S.C. § 405(g); see Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  The Commissioner's findings may be set aside if they are based on legal error or are not supported by substantial evidence.  See Reddick, 157 F.3d at 720.  Substantial evidence is defined as relevant evidence that a reasonable person might accept as adequate in support of a conclusion; it is "more than a mere scintilla but less than a preponderance."  Id.; see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.1997).  Reasoning not relied upon by the

ALJ cannot be relied upon to affirm the ALJ's decision.  See Cequerra v. Sec'y, 933 F.2d 735, 738 (9th Cir. 1991).

To determine whether the ALJ's decision is supported by substantial evidence, courts review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's decision.  See Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the evidence is susceptible to more than one rational interpretation, the Court must uphold the ALJ's conclusion.  Id. at 1030-40.  The trier of fact, not the reviewing court, must resolve conflicting evidence, and if the evidence can support either outcome, the reviewing court may not substitute its judgment for the judgment of the ALJ.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).  An ALJ's decision will not be reversed for harmless error.  Id.; see also Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991).

### A.  Definition of Disability

In order to qualify for disability insurance benefits, a plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration ("SSA") utilizes a five-step sequential evaluation process in making a determination of disability.  20 C.F.R. § 404.1520; see Reddick, 157 F.3d at 721.  If the SSA finds that the claimant is either disabled or not disabled at a step, then the SSA makes the determination and does not go on to the next step; if the determination cannot be made, then the SSA moves on to the next step.  See 20 C.F.R. § 404.1520.

### B.  Determination of Disability

First, the SSA looks to the claimant's work activity, if any; if the claimant is engaging in substantial gainful activity, she is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(I).  Second, the SSA considers the severity of impairments; the claimant must show that he has a severe medically determinable physical or mental impairment (or combination of severe impairments) which has which has lasted or is expected to last twelve months or end in death.  See 20 C.F.R. §

404.1520(a)(4)(ii). Third, the SSA considers whether a claimant's impairments meet or equal a listing in 20 C.F.R. Part 404 Appendix 1. If so, the claimant is deemed disabled. See 20 C.F.R. § 404.1520(a)(4)(iii). Fourth, the SSA considers the claimant's residual functional capacity ("RFC") and past relevant work. If the claimant can still engage in past relevant work, he is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv). Fifth, the SSA considers whether, in light of the claimant's RFC and age, education, and work experience, the claimant is able to make an adjustment to another occupation in the national economy; if so, the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).

The claimant bears the burden on steps one through four. See Reddick, 157 F.3d at 721. If a claimant establishes an inability to perform her prior work at step four, the burden shifts to the SSA to show that the claimant can perform other substantial work that exists in the national economy at step five. Id.

## III. DISCUSSION

### A. Weight Assigned to Treating Medical Sources

Plaintiff contends that the ALJ erred in assigning little weight to the findings of Plaintiff's treating medical providers, Drs. Li and Slater, without providing the appropriate reasons for doing so. The Ninth Circuit employs a hierarchy with respect to the weight that the ALJ is to give medical opinions. Specifically, it "distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Id. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Ryan v. Comm'r of Soc. Sec. Admin, 528 F.3d 1194, 1198 (9th Cir. 2008). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id. The opinions of Drs. Li and Slater were contradicted by the state agency's

consulting physician, so the ALJ was required to provide specific and legitimate reasons for rejecting them.

### 1. **Dr. Slater**

Plaintiff assigns error to the ALJ's decision to give limited weight to Dr. Slater's opinions about the severity of her functional limitations. In assigning limited weight, the ALJ explained that Dr. Slater's opinion included the disclaimer that he was not asked to make a formal assessment of Plaintiff's occupational functional capacity, and that his "responses are based on [Plaintiff's] self-report and observations in session; no formal psychological assessment or assessment of response style was conducted, and no collateral information was gathered." She also considered his prognosis for Plaintiff as guardedly positive and that she was somewhat stable, as confirmed by Dr. Li's notes that she was stable with medication. Moreover, she explained that Dr. Slater's assessment of significant problems with social interaction was not corroborated with treatment notes. The ALJ concluded that Dr. Slater's opinions supported her decision that Plaintiff is capable of performing simple, repetitive tasks.

As to the ALJ's conclusion that Dr. Slater's opinions supported her determination about Plaintiff's capacity for performing simple, repetitive tasks, Plaintiff persuasively argues that Dr. Slater's opinion does not support that conclusion and she took his comments out of context. Dr. Slater opined that Plaintiff did not have fundamental deficits in cognitive functioning or the ability to complete simple tasks, but her ability to complete simple tasks is undermined by her emotional distress. He referenced her avoidance of and inability to complete simple tasks, such as performing household tasks or enrolling in educational classes, as indicative of the way her depression and anxiety interfere with her ability to functional in the workplace. His opinion that Plaintiff incapable of performing simple tasks is confirmed by his functional assessments that she is moderately severely limited in her ability to carry out four functions that are critical to performing unskilled work and severely limited in a fifth critical function. Thus, Dr. Slater's opinion expressly contradicts the ALJ's RFC assessment.

Dr. Slater's statement that he was "guardedly positive" about her long-term prognosis is also not a specific and legitimate reason to reject his opinions. The ALJ ignored his statement that

although he was guardedly positive about Plaintiff's prognosis, her "symptoms are unlikely to change in the near term future" and she had exhibited the assessed limitations since the start of therapy with him in October 2014. While he stated that her condition had stabilized on her medications and long-term psychotherapy was likely to be helpful, he also opined that the limitations he assessed in the medical source statement have lasted for twelve continuous months or can be expected to last twelve continuous months at the assessed severity, which is the standard for finding that a claimant has a disability.

The ALJ also concluded that she could not rely on his opinions because she could not corroborate his opinions with his treatment notes. At the hearing, Plaintiff's attorney explained that Dr. Slater did not provide his treatment notes and the ALJ did not independently seek to obtain them. The Ninth Circuit has rejected the absence of treatment notes as a basis for rejecting a physician's opinions when the ALJ had an opportunity to obtain them. In Smolen v. Chater, it explained that

> the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . [t]his duty exists even when the claimant is represented by counsel. If the ALJ thought he needed to know the basis of Dr. Hoeflich's opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them. He could also have continued the hearing to augment the record. Having failed to fully develop the record regarding the basis for Dr. Hoeflich's opinions, the ALJ could not then reject those opinions -- which were uncontroverted and corroborated -- because they were given in response to leading, hypothetical questions.

80 F.3d 1273, 1288 (9th Cir. 1996) (internal citations omitted). Defendant cites Magallanes v. Bowen, 881 F.2d 747 (9th Cir. 1989), for the general proposition that an "ALJ need not accept a treating physician's opinion which is 'brief and conclusory in form with little in the way of clinical findings to support [its] conclusion.'" Id. at 751 (quoting Young v. Heckler, 803 F.2d 963, 968 (9th Cir. 1986)). However, Dr. Slater's opinion was not "brief and conclusory" because in addition to the checklist of Plaintiff's limitations he also provided a detailed summary of the basis for the noted limitations. The other cases Defendant cites are not applicable because, in those cases, the rejected opinions were inconsistent with the doctor's treating notes.

Moreover, Dr. Slater's opinions were uncontroverted and largely corroborated by Dr. Li. The ALJ's decision to give his opinions limited weight because she could not review his treatment notes is not a clear and convincing reason when it was incumbent upon her to obtain his treatment notes if she decided that they were necessary to assess his opinions.

Finally, the ALJ's rejection of Dr. Slater's opinions on the grounds that they were "based on the claimant's self-report and observations but without formal assessment of occupational functioning" is also not a specific and legitimate reason. As the Ninth Circuit has explained, "[t]o allow an ALJ to discredit a mental health professional's opinion solely because it is based to a significant degree on a patient's 'subjective allegations' is to allow an end-run around our rules for evaluating medical opinions for the entire category of psychological disorders." Ferrando v. Comm'r of Soc. Sec. Admin., 449 Fed. App'x 610, 612 n.2 (9th Cir. 2011). By the nature of their practices, "mental health professionals frequently rely on the combination of their observations and the patient's reports of symptoms." Id. "Disability may be proved by medically-acceptable clinical diagnoses, as well as by objective laboratory findings." Bilby v. Schweiker, 762 F.2d 716, 719 (quoting Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975)). Thus, formalized studies and assessments are not necessarily required to substantiate a medical source's opinions about the existence of a disability and a medical source's opinions do not fail merely because they lack "supporting objective findings." Id.

Dr. Slater explained that his opinions were based on his observations and Plaintiff's reported symptoms, noting that he "always consider[s] intentional or unconscious attempts at impression management when there is potential external secondary gain." AR 652. In this case, Dr. Slater determined that there was no "overt evidence of attempts to exaggerate her level of impairment" and, to the contrary, he believed Plaintiff was more likely to minimize her complaints and would "only discuss them when pressed further." AR 652. Moreover, none of the state agency physicians upon whom the ALJ relied based their opinions that Plaintiff is not disabled on a formal assessment of occupational functioning.

2.  **Dr. Li**

Dr. Li opined that Plaintiff had many limitations to her ability to work that rendered her

disabled. The ALJ provided numerous reasons for assigning Dr. Li's opinions little weight in reaching her assessment of Plaintiff's RFC and, ultimately, her determination that Plaintiff is not disabled. First, the ALJ noted that Dr. Li guessed at some questions because Plaintiff has no work history. AR 27. Second, Dr. Li said that her opinions about Plaintiff's functional ability "probably" existed while she was in high school even though she had only treated her since March 2013 when Plaintiff was nineteen years old. AR 27. Third, she found that Dr. Li's opinions are inconsistent with the results of the mental status examinations she gave to Plaintiff which only showed a depressed mood with no significant signs of anxiety or other abnormal clinical signs. Fourth, the ALJ reasoned that there is no correlation between completing high school and the ability to perform simple, repetitive tasks, contrary to Dr. Li's rationale for guessing that Plaintiff had substantial loss of ability to carry out simple instructions. AR 27.

Plaintiff persuasively argues that these were not specific and legitimate reasons for giving only little weight to Dr. Li's opinions as her treating doctor. First, even if Dr. Li did not have sufficient information to opine as to some of the limitations and provided her best informed guess about Plaintiff's restrictions, that is only a valid basis for rejecting those specific opinions. Dr. Li clearly indicated where she felt she had an adequate basis for her opinion and where she did not.

The purported inconsistency between her opinions and the mental status tests is not a valid reason for rejecting her opinions. The ALJ is correct that the mental status exams that Dr. Li conducted during Plaintiff's appointments indicated only that she had a depressed mood and did not otherwise demonstrate any abnormal behavior. However, Dr. Li was not constrained to make her assessment of Plaintiff's limitations solely on the results of mental status examinations, which are of somewhat limited usefulness because they are not full diagnostic exams but only provide the doctor's impression of her patient's current mental status. The mental status examinations are not substantial evidence for discounting Dr. Li's opinions and that is the only medical evidence that the ALJ based her decision on.[3]

---

[3] Plaintiff also argues that the ALJ is not a qualified mental health professional and the mental health professionals who did review the record (i.e., the state agency physicians) did not comment on an inconsistency. However, Dr. Li had not completed her medical source statement at the time the state agency physicians completed their review of the record.

### 3.    Reliance on Nonexamining State Agency Physicians

Finally, Plaintiff contends that the ALJ erred in relying on the nonexamining state agency physicians' opinions that Plaintiff retains the ability to perform simple, repetitive tasks with occasional interaction with co-workers and the public in rejecting the opinions of doctors Li and Slater.  Generally, the "opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  This admonition that the ALJ not rely solely on the opinions of nonexamining physicians is particularly apt in this case because the nonexamining physicians here, Drs. Leizer and Colsky, rendered their opinions in December 2013 and March 2014, respectively, without the benefit of the subsequent opinions of Plaintiff's treating doctors Li and Slater.  Moreover, as Plaintiff points out, the ALJ assessed greater limitations on concentration, persistence, or pace than were assessed by the nonexamining physicians.

On remand, the ALJ should re-consider whether and to what extent she should credit the opinions of doctors Li and Slater.  If she determines that she cannot fully credit their opinions, the ALJ must provide specific and legitimate reasons for her conclusion.

### B.    Credibility Determination

The ALJ concluded that Plaintiff's subjective complaints about her symptoms were not fully credible, which Plaintiff contends was error.  In order to find a claimant's testimony regarding symptoms unreliable, the ALJ is "required to make 'a credibility determination with findings sufficiently specific to permit the courts to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002)).  The Ninth Circuit requires the ALJ to conduct a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  See Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Id. (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir.

2007)) (internal citations omitted).

If the claimant has presented evidence to satisfy the first step, "and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear, and convincing reasons for doing so.'" Garrison, 759 F.3d at 1014-15 (quoting Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996)). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (citing Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993); Varney v. Secretary of Health & Human Servs., 846 F.2d 581, 584 (9th Cir. 1988)). The ALJ may consider many factors when weighing the claimant's credibility, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" Garrison, 759 F.3d at 1015 (quoting Moore v. Comm'r of Soc. Sec. Admin, 278 F.3d 920, 924 (9th Cir. 2002)).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms and there was no evidence of malingering, so the ALJ's reasons for discrediting Plaintiff's subjective complaints must be specific, clear, and convincing. The ALJ provided several reasons for discounting Plaintiff's complaints, which the Court addresses in turn.

First, the ALJ noted that Plaintiff reported severe social anxiety, but also admitted to regular contact with her mother and certain relatives, attending movies with her mother, and, according to an email in the medical record, Plaintiff joined her mother to pick strawberries on one occasion. These extremely limited interactions with her mother with whom she lives and a limited circle of relatives, do not undermine Plaintiff's complaints of extreme discomfort in social situations. These outings with her mother are also not inconsistent with her testimony that she

United States District Court
Northern District of California

1   would accompany her mother to the movies and on errands at her mother's request. Moreover, the

2   ALJ slightly mischaracterizes Plaintiff's testimony about her interactions with family members

3   besides her mother, as she explained that she does not personally interact with other family

4   members when they come to her house but only observes their interactions with each other

5   without participating.

6   The ALJ also attached significance to one email from Plaintiff to Dr. Li in which she asked

7   for permission to try a prescription for Wellbutrin because a friend experienced positive results on

8   the medicine. In some measure, the email raises questions about whether she has exaggerated the

9   extent to which she no longer has friends because of her depression and anxiety. (Other evidence

10  in the record is also somewhat inconsistent with Plaintiff's alleged limitations, but the ALJ did not

11  note those instances.) The ALJ is permitted to rely on traditional credibility tests, with

12  inconsistent statements being one of the most common. Standing alone, however, this single

13  reference to discussing medication with a friend does not significantly undermine Plaintiff's

14  testimony. It is consistent with evidence in the medical record that she had obtained some relief

15  from her medications, which permitted some level of social reengagement, but then when the

16  medications' efficacy declined she retreated from her friends again. That Plaintiff was able to

17  interact with one person during the course of her treatment is not necessarily inconsistent with her

18  testimony over a year later that she no longer socialized with friends.

19  The next reasons the ALJ proffered for discrediting Plaintiff's testimony were that she has

20  consistently attended weekly therapy with Dr. Slater and another individual starting in October

21  2014 and that she has written many emails to Dr. Li about her symptoms and treatment. Neither

22  of these reasons meets the clear and convincing standard. Plaintiff's willingness to attend weekly

23  therapy speaks more to her desire to improve her condition than her ability to interact with others

24  in the workplace. In fact, she testified that she often needs her mother to attend doctors'

25  appointments with her because she is scared to go alone. The relationship between a doctor and

26  patient is not the same as the relationship between an employee and co-worker or between an

27  employee and supervisor. Her treating physicians have had the opportunity to observe and assess

28  her functional limitations to interact appropriately and productively in the course of their

United States District Court
Northern District of California

consistent interactions with Plaintiff and yet still arrived at the conclusion that she had material impairments to her ability to function in the workplace. Finally, Plaintiff's numerous emails with Dr. Li do not contradict her claim of debilitating social interaction because they are written, not in-person communication.

The ALJ's reliance on Plaintiff's testimony about her sleeping habits is similarly insufficient. The ALJ noted that Plaintiff claims to have difficulty waking up in the morning, but that was explained by her testimony that she goes to bed between midnight and 3:00 a.m. and then sleeps into the afternoon. However, there is consistent evidence in the record that Plaintiff has long complained about difficulty sleeping and takes sleeping aids as a result.

The ALJ also focused on Plaintiff's statements that she has lost interest in her personal care by rationalizing Plaintiff's testimony that she only grooms and changes out of her pajamas on days when she has appointments as having more to do with the fact that she has few appointments than with any diminished interest in her personal care. However, she testified that she did not make more social plans because of her depression and anxiety. There is nothing in the record contradicting Plaintiff's testimony that her lack of appointments and the disinterest in personal grooming and hygiene were bound to her alleged symptoms of severe depression and anxiety.

Finally, the ALJ cited what she considered Plaintiff's conservative care as another reason for discrediting her complaints, describing her treatment as inconsistent with the severe and persistent symptoms and limitations she claimed. The ALJ did not discuss why she considered the treatment Plaintiff received to be conservative. It appears to be the treatment that was recommended by her doctors, and, indeed, Dr. Slater, who assessed serious limitations to Plaintiff's ability to work, recommended her current therapy as her long-term treatment plan. There is no evidence that her doctors prescribed or recommended treatment that Plaintiff did not try or that was more aggressive than the treatment she received. See Miller v. Chater, 99 F.3d 972, 977 (10th Cir. 1996) (explaining that it was error for the ALJ to assume that a claimant would have undertaken a different treatment plan if he experienced the side effects alleged because doing so "overstepped his bounds into the province of medicine"). This is not the situation where Plaintiff "fail[ed] to seek treatment or follow a prescribed course of treatment," which could be an

appropriate read to cast doubt on her testimony. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). On the one hand, the ALJ discredited Plaintiff because she sought consistent treatment but, on the other hand, discredited her for the treatment she receives.

For the reasons discussed above, the ALJ has failed to meet the standard for discrediting Plaintiff's subjective complaints. On remand, the ALJ should re-consider whether Plaintiff is credible and, if she determines that she is not credible, the ALJ must provide specific, clear, and convincing reasons for why she does not believe her complaints.

### C.    Treatment of Lay Person Testimony

Next, Plaintiff contends that the ALJ erred by failing to set forth adequate reasons for rejecting her mother's report about Plaintiff's condition. "Lay testimony as to a claimant's *symptoms* is competent evidence which the Secretary must take into account, unless he expressly determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'" Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (quoting Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)) (emphasis in original). This is in contrast to lay testimony about a claimant's medical diagnoses, which is "beyond the competence of lay witnesses and therefore do not constitute competent evidence." Id. If the ALJ does not take into account "competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Stout v. Commissioner, 454 F.3d 1050, 1056 (9th Cir. 2006).

Plaintiff's mother completed a questionnaire about Plaintiff's limitations and activities of daily living. In finding that the mother's statement was "not entirely credible," the ALJ explained that she "corroborated [Plaintiff's] allegations; however the evidence as a whole does not support the degree of functional loss and the severe symptoms alleged." AR 29.

This generalized, boilerplate statement does not satisfy the requirement that the ALJ consider the mother's lay witness statement about Plaintiff's ability to work and provide a cogent explanation for why she did not credit the statement. The ALJ provided no reasons that were germane to the mother's statement or even any specific explanation for why her statement was

incompatible with the record as a whole.  Although the ALJ's reasons for discrediting Plaintiff's testimony might apply equally to the corroborating statement of her mother under certain circumstances, the ALJ did not sufficiently supported her negative credibility about Plaintiff's testimony and the ALJ did not state that she rejected the mother's statement on the same grounds as Plaintiff's complaints.  See Valentine v. Astrue, 574 F.3d 685, 694 (9th Cir. 2009) (holding that the ALJ provided germane reasons for rejecting a spouse's testimony that largely mirrored the claimant's properly discounted testimony).  This error was not harmless because if the mother's testimony were fully credited, a reasonable ALJ could have reached a different disability determination.

On remand, the ALJ should re-consider whether Plaintiff's mother is credible and, if she determines that she is not credible, the ALJ must provide germane reasons for why she does not believe her statement.

**D.     RFC Assessment**

"A hypothetical question posed to a vocational expert must 'include all of the claimant's functional limitations, both physical and mental.'"  Brink v. Comm'r Soc. Sec. Admin., 343 F. App'x 211, 212 (9th Cir. 2009) (unpublished) (citing Flores v. Shalala, 49 F.3d 562, 570 (9th Cir. 1995)).  Plaintiffs contends that the ALJ erred when she found that Plaintiff has "moderate difficulties maintaining concentration, persistence, or pace" (AR 23), but then did not include any limitations in concentration, persistence, or pace in her RFC assessment.

Plaintiff is correct that when assessing if Plaintiff's impairments met or equaled the severity of one of the listed impairments, the ALJ concluded that Plaintiff has moderate limitations as to concentration, persistence, and pace.  AR 23.  However, the RFC and the hypothetical posed to the vocational expert only mentioned a limitation to performing "simple, repetitive tasks" without including a limitation on concentration, persistence, or pace.  Plaintiff contends that this constituted error, citing Brink, 343 Fed. App'x at 212.  In Brink, the court found that the phrase "simple, repetitive work" did not encompass the ALJ's findings of moderate limitations in concentration, persistence, and pace, noting that "repetitive, assembly-line work of the type described by the expert might well require extensive focus or speed" which was not included in

the hypothetical the ALJ posed to the vocational expert.

Defendant responds that this issue is controlled by Stubbs-Danielson v. Astrue, 539 F.3d 1169 (9th Cir. 2008). There, the ALJ found that the plaintiff had mental limitations as to pace and concentration, but found that the plaintiff was capable of simple, repetitive tasks based on medical opinion testimony that noted the pace and concentration limitations but also found that the plaintiff was able to perform simple, repetitive work. Id. at 1173-74.

In this case, however, neither state agency physician found that Plaintiff had pace and concentration limitations. In response to whether Plaintiff had "difficulties in maintaining concentration, persistence or pace," Dr. Leizer stated that she had "none." AR 73. He later reiterated that she has "[n]o restrictions in claimant's abilities in regards to sustaining concentration, persistence and/or pace." AR 76. He further opined that Plaintiff "appears capable of performing work at all levels though with limited social interaction with the public and co workers." AR 76. Dr. Leizer did not make any specific finding that she was limited to simple, repetitive tasks. Similarly, on the reconsideration level, Dr. Colsky concluded that she had "[n]o restrictions . . . in regards to sustaining concentration, persistence and/or pace." AR 101. Dr. Colsky also opined that Plaintiff "appears capable of performing work at all levels though with limited social interaction with the public and co workers." AR 101. In partially crediting the statements of Plaintiff and her mother, the ALJ concluded that Plaintiff had moderate limitations as to pace, concentration, and persistence. Thus, Stubbs-Danielson is not applicable here because it did not address the relevant question of "whether an ALJ must incorporate her own findings into a vocational hypothetical," Rosas v. Colvin, 2015 WL 9455475, at *13 (N.D. Cal. Dec. 28, 2015), and the ALJ committed error under Brink.

Without including all limitations in a hypothetical posed to the vocational expert, the vocational expert's opinion that a claimant is capable of work has no evidentiary value. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). On remand, the ALJ should incorporate the appropriate limitation as to concentration, persistence, and pace into the hypothetical posed to the vocational expert.

### E.     Whether to Remand or Award Benefits

"The decision whether to remand a case for additional evidence, or simply to award benefits[,] is within the discretion of the court."  Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  "'If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded'" for further proceedings.  Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (quoting Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981)).  However, a court may also reverse and remand with instructions to calculate and award benefits "when it is clear from the record that a claimant is entitled to benefits."  Id.  Here, the ALJ committed legal error on numerous bases, all of which are better suited to further consideration by the ALJ.  See Brown-Hunter v. Colvin, 806 F.3d at 496 (quoting Treichler, 775 F.3d at 1101) ("Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate.").   Therefore, the Court remands this case for further proceedings, according to the instructions set forth above.

## IV.     CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment, and REMANDS for further proceedings.


**IT IS SO ORDERED.**

Dated: May 11, 2018


ELIZABETH D. LAPORTE
United States Magistrate Judge